## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-01595-KLM

DIABLO MEDIA, LLC, a Colorado limited
liability company,

        Plaintiff,

  v.

DDR MEDIA, LLC dba Turtle Leads, a
Pennsylvania limited liability company,
KASE LOGIC, LLC, a Pennsylvania limited
liability company, WHITNEY BRADLEY, an
individual, and DOES 1 THROUGH 10,

        Defendants.

---

## PLAINTIFF DIABLO MEDIA, LLC'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

---

Plaintiff Diablo Media, LLC ("Diablo" or "Plaintiff"), by and through its undersigned

counsel, respectfully responds to the Motion to Dismiss for Lack of Subject Matter Jurisdiction

filed by Defendants DDR Media, LLC dba Turtle Leads ("Turtle Leads"), Kase Logic, LLC, and

Whitney Bradley ("Bradley") (collectively, "Defendants").

## INTRODUCTION

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction can take many

forms, but Defendants' filing does not satisfy any of them. A Rule 12(b)(1) motion can serve as a

"facial" attack upon the Complaint, in which event, all allegations therein are presumed true

pursuant to a Rule 12(b)(6) standard. In their Motion, Defendants do not address the sufficiency of the allegations in the Complaint, nor would such a Motion be timely at this late stage in the case.

If it attacks the merits of the claims, a Rule 12(b)(1) motion is treated like a summary judgment motion, where evidence is received and weighed by the Court. Defendants claim to launch such a factual attack, but don't supply any evidence for the Court's review. The Motion contains no supporting declaration, no documents (even those expressly referenced within the Motion are not supplied to the Court), and nothing more than conclusory allegations. Because the Court must presume all disputed facts in favor of the non-moving party, the Motion fails.

As illustrated below, this Court has subject matter jurisdiction over Plaintiff's claim for misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA"). In fact, Defendants have already admitted this in their Amendment to Scheduling Order, Docket No. 21, filed September 14, 2021. Plaintiff has identified its trade secrets with particularity, took reasonable action to protect the confidentiality thereof, and was damaged when Defendants intentionally misappropriated the same when it hired eight (8) of Plaintiff's employees in succession over a two-year period, continuing even after this case was filed. Any holes in the evidence supporting Plaintiff's position are the sole result of Defendants' ongoing refusal to produce requested documents or otherwise comply with its discovery obligations.

In the alternative, Plaintiff can establish it has met the amount in controversy requirement for diversity jurisdiction because Defendants' own records demonstrate wrongful profits in an amount far exceeding $75,000. For all of these reasons, the Motion must be denied in its entirety.

//

# FACTUAL BACKGROUND

### A.   Statement of Undisputed Facts

The following facts are undisputed:[1]

1.      Plaintiff is a Colorado limited liability company with its principal place of business in Denver, Colorado. (D.E. 1 ["Complaint"] ¶6.)

2.      Plaintiff and Turtle Leads are competitors, with each being an affiliate advertising network specializing in lead generation. (D.E. 19 ["Scheduling Order] at ¶¶ 4(a), 4(c).)

3.      In addition to working through advertising affiliates, Plaintiff also generates leads for its advertising clients on its own and specializes in lead generation for attorneys. (Scheduling Order at ¶ 4(b).)

4.      Defendant Kase Logic is an advertising company formed expressly to generate leads for its advertising clients on its own and specializes in lead generation for attorneys.

5.      Defendant Whitney Bradley is the sole owner of Turtle Leads and the ultimate beneficial owner of 75% of Kase Logic. (Declaration of Virginia Sanderson in Support of Plaintiff Diablo Media, LLC's Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ["Sanderson Decl."], Ex. G.)

6.      The following individuals are the "Former Employees" of Plaintiff: Lindsey Nielson, Lauren Hines, Amie Twyford, Haley Betts, Samuel Caswell, Jenna Vick, Justin Rampy, and Brittany Bankston. (Scheduling Order at ¶4(f).)

---

[1] Diablo intends and reserves the right to file a separate motion for summary judgment on its claims prior to the upcoming deadline for dispositive motions; this opposition is not it, nor does it contain an exhaustive list of relevant undisputed facts. However, to the extent the Court interprets Defendant's motion for dismissal as being subject to Rule 56 standards, Diablo seeks to comply with the Court's Standing Order requiring a statement of undisputed facts.

7.     Like all employees of Plaintiff, each of the Former Employees accepted and executed an offer letter from Plaintiff that acknowledged they would have access to the trade secrets of Plaintiff, stating:

> Valuable Trade Secrets. You acknowledge and agree that in the course of your employment with the Company, you will be provided with and have access to, client, vendor, customer and contractor lists and other Company confidential and proprietary information, all of which are trade secrets of the Company. As such, you agree that your employment is contingent upon your execution of, and delivery to, the Company of a Confidential Information and Invention Assignment Agreement ("Intellectual Property Agreement") in the standard form utilized by the Company.

(Sanderson Decl., ¶2 & Ex. A.)

8.     Like all employees of Plaintiff, each of the Former Employees executed an Intellectual Property Agreement where, among other things, they promised to "hold in strictest confidence and … not disclose, use any for [their] own benefit or for the benefit of another, lecture upon or publish any of the Company's Proprietary Information." (*Id.* ¶3 & Ex. B.)

9.     As part of the Intellectual Property Agreement, each Former Employee also agreed as follows:

> **4. ADDITIONAL ACTIVITIES.** I agree that during the period of my employment by the Company I will not, without the Company's express written consent, engage in any employment or business activity which is competitive with, or would otherwise conflict with, my employment by the Company. I agree further that for the period of my employment by the Company and for one (1) year after the date of termination of my employment by the Company I will not, either directly or through others, (a) solicit or attempt to solicit any employee, independent contractor or consultant of the Company to terminate his or her relationship with the Company in order to become an employee, consultant or independent contractor to or for any other person or entity, (b) influence or attempt to influence any client of the Company to divert its business from the Company to any other person or company engaged in a similar business or to cease doing business with the Company, (c) make any statement or perform any act intended to cause existing or potential clients of the Company to make use of the services of any business competitive with the Company, or (d) hire or attempt to hire any person who was employed by the Company within the last six (6) months.

(*Id.*)

10.     Except for Samuel Caswell, each of the Former Employees left Plaintiff to work for its competitor, Turtle Leads. (Scheduling Order at ¶4(g); Sanderson Decl., Exs. C & I.)

11.     Former Employee Lindsay Nielson quit Plaintiff in November 2019 and went to work for Turtle Leads. (Scheduling Order at ¶ 4(g); Sanderson Decl., Exs. C, E, & I.)

12.     Lauren Hines quit Plaintiff in February 2020 and immediately went to work for Turtle Leads. (*Id.*)

13.     Amie Twyford quit Plaintiff on March 2, 2020 and went to work for Turtle Leads on March 10, 2020. (*Id.*)

14.     On March 24, 2020, Plaintiff received notice that Former Employees Hines and Twyford were seeking to bring a Plaintiff affiliate over to Turtle Leads when an email communication between them was inadvertently sent to Hines' old Plaintiff email address. (Sanderson Decl., Ex. D.)

15.     On March 27, 2020, Plaintiff provided written notice to Bradley and Turtle Leads of the existence of the Intellectual Property Agreements with each of the Former Employees and their non-solicitation and confidentiality obligations thereunder. (*Id*., Ex. E.)

16.     Bradley and Turtle Leads acknowledged receipt of Plaintiff's March 27, 2020 letter through their legal counsel. (*Id*., Ex. F.)

17.     Haley Betts quit Plaintiff in December 2019 and thereafter went to work for Turtle Leads. (*Id*., Ex. C.)

18.     Jenna Vick quit Plaintiff on February 26, 2021, but was hired by Turtle Leads one day prior, on February 25, 2021. (*Id.*)

19.     Samuel Caswell quit Plaintiff in February 2021 and thereafter partnered with Bradley to form Kase Logic. (*Id.* Ex. G.)

20.     Samuel Caswell is a 25% owner of Kase Logic. (*Id.*)

21.     In April 2021, Caswell began soliciting law firm clients of Plaintiff to purchase legal leads from Kase Logic, offering to beat Plaintiff's confidential prices by ten to fifteen percent. (*Id.* Ex. H.)

22.     On June 11, 2021, the Complaint in this action was filed. (Complaint.)

23.     Rampy quit Plaintiff in late June 2021 and thereafter went to work for Turtle Leads. (Sanderson Decl., Ex. I.)

24.     Brittany Bankston quit Plaintiff in October 2020, but did not go to work for Turtle Leads until April 2022. (*Id.*)

25.     Turtle Leads considers its list of advertisers to be a trade secret and has produced the same in this action on a "Confidential – Attorneys' Eyes Only" basis to prevent Plaintiff from seeing it. (Sanderson Decl., Ex. J.)

26.     Turtle Leads considers its list of affiliates to be a trade secret and has produced the same in this action on a "Confidential – Attorneys' Eyes Only" basis to prevent Plaintiff from seeing it. (*Id.*)

27.     Turtle Leads considers its campaign details to be a trade secret and has produced the same in this action on a "Confidential – Attorneys' Eyes Only" basis to prevent Plaintiff from seeing it. (*Id.*)

28.     Turtle Leads' gross income doubled from calendar year 2019 to calendar year 2020. (*Id.*, Exs. K & L.)

29.     Turtle Leads' gross income nearly doubled again from calendar year 2020 to calendar year 2021. (*Id.*, Exs. L & M.)

30.     Turtle Leads' increases in income after hiring the Former Employees far exceeds $75,000.[2] (*Id.*, Exs. K-M.)

## B.     Additional Background

Affiliate marketing is a marketing practice in which an online retailer compensates one or more online publishers for each visitor or customer generated for the retailer as a result of the affiliate's marketing efforts. Although it may seem counterintuitive, within the internet marketing industry, the retailer—that is, the one in need of advertising services—is called the "advertiser." The persons who place the advertisements on their websites and blogs are called, interchangeably, "publishers" or "affiliates." For ease of reference, they are simply referred to as "affiliates" throughout this Opposition. Their marketing techniques include everything from webpages, blogs, and online lists, to content-rich animated ads and mobile apps. (Complaint, ¶¶25-29.)

Rather than seek out qualified affiliates on their own, most advertisers work with affiliate networks such as Plaintiff and Turtle Leads. Under this model, the network enrolls hundreds of affiliates and acts as a matchmaker of sorts between advertiser and affiliate. (*Id.* ¶30.) The network generates performance data for each affiliate and campaign, and this enables it to match Affiliates and campaigns to maximize sales for the advertiser and revenue for itself. When a network is involved, the identity of the affiliates remains unknown to the advertisers. (*Id.* ¶32.)

---

[2] Turtle Leads' Profit and Loss statements for 2019, 2020, and 2021 have been designated as CONFIDENTIAL by Defendants and are submitted to this Court with Plaintiff's concurrently-filed Motion to Restrict. For this reason, and to avoid unnecessary restriction of additional documents, Plaintiff does not identify the exact amount of profits in this opposition, but these figures are available to the Court in such exhibits.

For these reasons, Plaintiff considers its affiliate list and performance data—such as conversion rate (rate at which affiliate generates a sale or other desired action for the advertiser), return on investment (advertiser's net profit vis-à-vis the affiliate) and other metrics to be its trade secrets. (Sanderson Decl., Ex. P.) Although not required under the DTSA or Colorado law, to facilitate discovery, Plaintiff served Defendants with a detailed Identification of Trade Secrets early in the case. (*Id.*)

## PROCEDURAL HISTORY

Relevant to Defendants' motion is the issue that Defendants have repeatedly failed to honor their discovery obligations in this case. Plaintiff served its First Set of Requests for Production of Documents (the "RFPs") and First Set of Interrogatories (the "Interrogatories") on Defendants on October 15, 2021. As the Court is already aware, the sufficiency of Defendants' responses to these written discovery requests—and, particularly, the RFPs—were the subject of ongoing dispute, and Plaintiff will not rehash it here. To date, Defendants have produced approximately 100 pages of unique documents in the litigation, but have withheld key information about their advertisers, affiliates, and the money earned by Defendants on the grounds that such information "cannot be protected by any confidentiality agreement," such as, presumably, the Court's Protective Order. (*See, e.g.*, Sanderson Decl., Ex. J (Defendants' objections and responses to RFP Nos. 5–12, 14.)

On February 7, 2022, Plaintiff propounded its First Set of Requests for Admission (the "RFAs") and Second Set of Requests for Production of Documents (the "Additional RFPs") upon Defendants. Defendants' then-counsel, Adrian Cousens, confirmed receipt of the same on the following day. (*Id.*, Ex. N.) On February 9, 2022, Defendants' new counsel, Vincent Lentini, introduced himself to counsel for Plaintiff and requested an extension of pending deadlines. (*Id.*,

Ex. O.) Plaintiff agreed, and Plaintiff's counsel informed Mr. Lentini of the RFAs and Additional RFPs that had just been served and agreed to a months' extension for response to the same. (*Id.*) The RFAs and Additional RFPs were discussed once more in the context of the Parties' Joint Motion and [Proposed] Order to Extend Fact Discovery Deadline for Written Discovery Only, Docket Entry 41, which was filed on March 18, 2022. (D.E. 41 at 2 ["WHEREAS, Plaintiff served additional Written Discovery Requests on Defendants on February 7, 2022 and, by separate agreement of the parties, extended the deadline for Defendants' response to April 6, 2022."].) Despite far more than the usual number of reminders regarding the RFAs and Additional RFPs, Defendants never responded to any of them.[3]

## ARGUMENT

### A.   Defendants have already admitted to the Court's subject matter jurisdiction.

As an initial matter, Defendants have already admitted to subject matter jurisdiction. Specifically, in Defendants' Amendment to Scheduling Order, Docket No. 21, filed September 14, 2021, Defendants stated: "**Defendants acknowledge that jurisdiction for Plaintiff's Federal law claims are properly before this Court pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1832, et seq.**" (D.E. 21 [emphasis added]; *see also* Scheduling Order for prior version.) The purpose of the Rule 26(f) conference and report to the Court is to clarify and confine the issues to be litigated, including to promote full disclosure of all facts to aid in the fair, prompt, and inexpensive disposition of lawsuits. *See Carlson Companies, Inc. v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080, 1100 (D. Minn. 1973); *Woldum v. Roverud Const., Inc.*, 43 F.R.D. 420, 420 (N.D. Iowa

---

[3] Rather than continue to battle Defendants, wasting time and money on motions to compel only to get a handful of documents in return, Plaintiff has instead decided to rely on the Defendants' admission to the RFAs, and each of them, per Fed. R. Civ. P. 36(a)(3).

1968).

Discovery is long over and the deadline for filing dispositive motions is approaching on June 30, 2022. Defendants' sudden change of position this late in the case is prejudicial to Plaintiff and appears to be an attempt to reset the case schedule in a new venue. As is evident by their Motion—which includes <u>absolutely no evidence</u> proffered by Defendants in support of their position—Defendants have not honored their discovery obligations in this case. The Court should view the instant Motion for what it is: a Hail Mary attempt by Defendants to save themselves from their own inaction over the past year. Plaintiff has already been prejudiced by Defendants' refusal to produce key documents and information relevant to the claims and defenses at hand. The Court should decline to give Defendants further reprieve at Plaintiff's expense.[4]

**B.      Legal Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction**

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure is a challenge to the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal courts are courts of limited jurisdiction, and it is presumed that a cause lies outside this limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the authority to grant the relief requested. *See id.*

A Rule 12(b)(1) challenge to subject matter jurisdiction can be either facial or factual. *See*

---

[4] Despite allegedly challenging Plaintiff's Complaint on factual grounds, and despite Defendants' failure to properly abide by discovery deadlines (including by failing to depose Plaintiff) and requirements in responding to Plaintiff's discovery requests, Defendants have not requested additional discovery on its motion. If Defendants, in their reply, request additional discovery, Plaintiff opposes such request as prejudicial. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").

*Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021), *cert. denied*, 142 S. Ct. 772 (2022), *reh'g denied*, 142 S. Ct. 1195 (2022) (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)). A facial attack questions the sufficiency of the complaint, and when reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true. *See Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021), *cert. denied*, 142 S. Ct. 772 (2022), *reh'g denied*, 142 S. Ct. 1195 (2022). A factual attack goes beyond allegations in the complaint and challenges the facts on which subject matter jurisdiction depends. *See Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021), *cert. denied*, 142 S. Ct. 772 (2022), *reh'g denied*, 142 S. Ct. 1195 (2022). When reviewing a factual attack, a court may not presume the truthfulness of the complaint's factual allegations, and may consider affidavits and other documents to resolve disputed jurisdictional facts under Rule 12(b)(1) without converting the motion to a summary judgment motion. *See Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021), *cert. denied*, 142 S. Ct. 772 (2022), *reh'g denied*, 142 S. Ct. 1195 (2022).

However, when the question of the applicability of the discretionary function exception is intertwined with the merits of the case, the motion to dismiss should be construed as a motion for summary judgment. *See Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021), *cert. denied*, 142 S. Ct. 772 (2022), *reh'g denied*, 142 S. Ct. 1195 (2022). Although the Tenth Circuit has held that "[t]he jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case," *see Holt*, 46 F.3d at 1002, it later clarified that "the focus of the inquiry is not merely on whether the merits and the jurisdictional issue are under the same statute."

*See Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021), *cert. denied*, 142 S. Ct. 772 (2022), *reh'g denied*, 142 S. Ct. 1195 (2022) (citing *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1324 (10th Cir. 2002)). Instead, whether a motion to dismiss must be converted to a motion for summary judgment depends on whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim. *See Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *3 (10th Cir. Aug. 16, 2021), *cert. denied*, 142 S. Ct. 772 (2022), *reh'g denied*, 142 S. Ct. 1195 (2022) (citing *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1324 (10th Cir. 2002)).

Defendants argue that their motion raises a factual challenge to the existence of subject matter jurisdiction, and because the existence of a trade secret and its misappropriation are prerequisites to the application of the DTSA, the Court should consider the evidence submitted in its Motion under the Rule 12(b)(1) standard rather than the Rule 12(b)(6) standard. However, Defendants are incorrect. First, Defendants have submitted no evidence—at all—in support of their Motion, and specifically Defendants have submitted no evidence: 1) in support of their arguments that no trade secrets exist sufficient to confer jurisdiction under the DTSA, and 2) that the amount in controversy does not meet the diversity jurisdictional standards. Thus, it appears that Defendants are trying to make a facial attack on the pleadings. But even if Defendants are making a factual challenge to the Complaint, their arguments still fail.

As a preliminary matter, if jurisdiction is intertwined with the merits of the case, and the challenge is facial, the Court must apply the Rule 12(b)(1) standard. *See Ratheal v. United States*, No. 20-4099, 2021 WL 3619902, at *4 (10th Cir. Aug. 16, 2021), *cert. denied*, 142 S. Ct. 772 (2022), *reh'g denied*, 142 S. Ct. 1195 (2022). But here, where Defendants challenge the sufficiency

of the Complaint on factual grounds, the Court must apply standards applicable to a summary judgment motion. *See id*. Finally, as discussed further below, many of the facts and arguments in Defendants' motion are going to be addressed in Plaintiff's forthcoming motion for summary judgment, and as such the Court should withhold ruling on these issues until that time. *See id*.

**C.      Plaintiff has properly pleaded a claim under the Defend Trade Secrets Act, 18 U.S.C. §1832, *et seq*. ("DTSA"), invoking federal subject matter jurisdiction.**

The DTSA defines a trade secret as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. §1839(3); *see also Assessment Techs. Inst., LLC v. Parkes*, No. 19-2514-JAR, 2022 WL 1102461, at **20–21 (D. Kan. Mar. 2, 2022).

To prevail on a claim for misappropriation of trade secrets, Plaintiff must show: 1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; 2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and 3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means. *See Marsh USA, Inc. v. Cobbs Allen Cap., LLC*, No. 19-CV-03266-RM-STV, 2020 WL 9424331, at *3 (D. Colo. Aug.

19, 2020).

Here, Plaintiff has identified the following trade secrets: 1) the identity of Plaintiff's affiliates, 2) all performance data for Plaintiff's campaigns, including campaign conversion rates and return on investment ("ROI") data that demonstrate how profitable a particular campaign or affiliate is, 3) the cost-per-action (CPA) fee paid by the advertiser for each advertising campaign, and 4) the identity of the sources from which Plaintiff procures data lists (*e.g.*, email lists) to broker or sell. (Sanderson Decl., Ex. P.) Plaintiff's trade secrets also include the following processes or methods: 5) Plaintiff's lead generation advertising methods, and 6) Plaintiff's methods for managing data lists. (*Id.*)

### 1.   Plaintiff's Affiliate Lists

Defendants argue that existence of an agreement to protect data and methods that are trade secrets, by itself, is insufficient to demonstrate that all data or method so learned during employment are actually trade secrets. (Mot. at p. 7, ¶28.) *See Am. Paper & Packaging Prod., Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1325 (Cal. Ct. App. 1986). However, this case cited by Defendants further states that "[t]he court should view *all of the evidence* presented in making its determination," [emphasis added], and an employee confidentiality agreement is not the sole basis for Plaintiff's trade secret designation. Rather, Colorado courts have held that consumer lists can be trade secrets when the owner of the trade secret has taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes. *See Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 522 (Colo. App. 2011) (citing Colo. Rev. Stat. Ann. § 7-74-102(4)). Indeed, requiring employees to sign the Offer Letter and Intellectual Property Agreement is one of the methods Plaintiff took to ensure that its customer

lists would remain confidential.

Defendants also argue that Plaintiff alleges its trade secrets are trade secrets because Plaintiff does not disclose customer lists publicly. (Mot. at p. 8, ¶29.) In fact, the Tenth Circuit has held that a customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available. *Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1114 (10th Cir. 2009). Moreover, an affiliate list is not a typical "customer" list—affiliates drive traffic to advertising campaigns, whereas advertisers are the "customers" who pay for such services. The whole purpose of an advertising network like Plaintiff or Turtle Leads is to add an element of anonymity between the advertiser and affiliate, and the keys to network success are (1) successful affiliates that are (2) matched with the right campaigns to maximize conversion rate and ROI for the advertiser. Each of the Former Employees was charged with recruiting affiliates and serving as the campaign matchmaker—a task enabled by the historical conversion rate and ROI data for the affiliate that the Former Employees only had access to pursuant to the Offer Letter and Intellectual Property Agreement. In other words, an affiliate list is not a traditional Rolodex-style customer list, it is inextricably intertwined with the performance data that is also a trade secret. <u>It is not only about who the affiliates are and how to contact them, it's knowledge about what the affiliates can do.</u> Defendants' position that Turtle Leads' own affiliate lists and campaign data are trade secrets, and their ongoing refusal to produce CPA, conversion rate, or ROI data even under the protection of AEO designation, serves as an outright admission that such are considered trade secrets within the affiliate marketing industry. (*See, e.g.*, Sanderson Decl., Ex. J, Defendants' discovery responses claiming that such information is "information which cannot be protected by any confidentiality agreement" and

refusing to produce the same.)

Defendants also argue that Plaintiff's position treads dangerously close to imposing the inevitable disclosure doctrine to gain Federal jurisdiction, and that the DTSA does not recognize this doctrine. (Mot. at p. 4, ¶14; p. 10, ¶41.) First, for this proposition, Defendants cite to a law review article, not any actual case law. In fact, what courts have done is apply state law in determining whether the inevitable disclosure doctrine applies in that state. *See, e.g., UCAR Tech. (USA) Inc. v. Yan Li*, No. 5:17-CV-01704-EJD, 2017 WL 6405620, at *3 (N.D. Cal. Dec. 15, 2017), *on reconsideration on other grounds*, No. 5:17-CV-01704-EJD, 2018 WL 2555429 (N.D. Cal. June 4, 2018) (striking allegations relying on "inevitable disclosure" theory as being rejected by California courts); *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1069 (N.D. Ill. 2020) ("Illinois courts have found that plaintiffs can state a claim for threatened misappropriation by demonstrating the inevitability of trade secret disclosure…" (citing *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995)); *Jazz Pharms., Inc. v. Synchrony Grp*., LLC, 343 F. Supp. 3d 434, 446 (E.D. Pa. 2018).

The inevitable disclosure doctrine is a theory of preliminary relief for claims of misappropriation of trade secrets when an employee's new employment will inevitably lead him or her to rely on the former employer's trade secrets. *See Bradbury Co. v. Teissier-duCros*, 413 F. Supp. 2d 1203, 1208 (D. Kan. 2006). But if *one* former employee is likely to disclose or rely upon trade secrets, what about *eight*? What if *half* of the new employer's workforce consisted of the former employer's workforce? Admittedly, research finds no case under the DTSA where the defendant has been so bold as those here, where they continually poached employees from a competitor on the other side of the country—including five (5) employees after being notified of

the existence of the Intellectual Property Agreements and including two (2) employees after this case was filed! There are hundreds of affiliate networks in the United States, including many within Pennsylvania. Hiring Plaintiff's employees was <u>not</u> Defendants' only option, and they offer <u>no</u> explanation in their Motion as to why they did so, repeatedly, or why Bradley and Caswell conspired to form a legal lead generation company using Plaintiff's methodology to directly compete with Plaintiff. That is because the only reason that makes sense is that they were profiting from this practice (which is confirmed in Turtle Leads' financial statements) and, in order to continue to do so, they needed additional people to bring over new information and accounts from Plaintiff. Defendants' own actions are sufficient to prove that disclosure of Plaintiff's trade secrets was not only inevitable, but, in fact, occurred. The Court needs no other evidence, especially to resolve this motion, that Defendants have benefitted and continue to benefit from the Former Employees' knowledge of Plaintiff's trade secrets.

In sum, Defendants have not met their burden under the instant motion to dismiss Plaintiff's claims for lack of subject matter jurisdiction, regardless of which standard the Court applies. If Defendants are attacking the face of the Complaint, Plaintiff has sufficiently set forth well-pleaded claims in the Complaint to survive this motion. If Defendants are attacking the merits, the Court is required to transform this motion into a motion for summary judgment, assume any disputed facts in Plaintiff's favor as the non-moving party, and thus Plaintiff is entitled to relief. *See Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 982 (10th Cir. 2002), *as amended on denial of reh'g* (Jan. 23, 2003).

## 2. <u>Plaintiff's Methods</u>

Defendant argues that Plaintiff only has a "hunch" that its proprietary methods are being

used, but does not identify what makes them proprietary. (Mot. at p. 11, ¶45.) Defendant is incorrect. Plaintiff identified as its trade secrets the following methods and processes: 1) its lead generation advertising methods; and 2) its list management services methods. (Sanderson Decl., Ex. P.) It is undisputed that Plaintiff has operated a legal lead generation business for mass tort actions for several years, and that Caswell oversaw the same during his tenure at Plaintiff. (*Id.*, Ex. A.) It is undisputed that, within days or weeks of his leaving Plaintiff, Bradley and Caswell formed Kase Logic and launched a lead gen website focusing on the exact same mass tort areas as Plaintiff. It is further undisputed that Caswell then reached out to law firms and other legal advertisers for business, promising a 10 to 15 percent discount and specific ROIs despite the fact that Kase Logic had no history of the same. (*Id.*, Exs. G & H.) The only reasonable conclusion to be drawn is that Caswell was relying on his knowledge of Plaintiff's pricing and ROI data—that is, Plaintiff's trade secrets—in making such promises. This is far more than a hunch. To the extent Plaintiff is unable to prove what exactly Bradley and Caswell discussed and how Plaintiff's lead generation methods factored into it, this is entirely because Defendants have refused to produce any such communications in discovery. Defendants cannot refuse to produce evidence and then claim "there is no evidence." If there is an inference to be drawn as a result of Defendants' discovery failures, it must be drawn in Plaintiff's favor.

Furthermore, despite claiming that they are making a factual attack on the existence of subject matter jurisdiction, Defendants have submitted <u>no</u> evidence in support of this attack. Even if Defendants had submitted evidence in support of their motion to dismiss, such evidence cannot be treated, for purposes of the motion, as proof contradictory to the well-pleaded facts in the Complaint. *See Farrall v. D.C. Amateur Athletic Union*, 153 F.2d 647, 648 (D.C. Cir. 1946). Thus,

if a fact is averred in the complaint and contradicted in the affidavit, the latter version cannot be accepted by the court for the purposes of a motion to dismiss. *See id.* Because Plaintiff has sufficiently pleaded a claim for violation of the DTSA, Defendants' motion to dismiss for lack of subject matter jurisdiction must be denied.

D.      **In the alternative, Plaintiff has properly pleaded diversity jurisdiction, where Plaintiff and all Defendants are residents of different states, and where the amount in controversy exceeds $75,000.00.**

28 U.S.C. §1332 gives federal courts original subject matter jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. Defendants do not dispute that Plaintiff and all named Defendants are citizens of different States.[5] Rather, Defendants claim that the amount in controversy is not met because the Complaint and the "Record" that Defendants have decided to selectively include in their motion to dismiss shows only one Plaintiff client that Defendants allegedly "poached" from Plaintiff, and that Plaintiff thus must demonstrate that the amount in controversy exceeds $75,000 in total damages. Defendants then argue that Plaintiff never even made $75,000 of profit from this "poached" client, Braintrust, and thus the amount in controversy is not met.

It's important to note at the outset that, in making this argument, Defendants essentially

_____

[5] Defendants argue that Plaintiff "fail[s] to name the former employees that plaintiff claims violated their agreements" in seeking to maintain diversity jurisdiction. (Mot. at p. 14, ¶58.) This is not true. First, as Defendants have already admitted, the Court has subject matter jurisdiction over Plaintiff's DTSA claim and diversity jurisdiction is only pled in the alternative. Second, Plaintiff is well within its rights to decide to pursue its claims only against the parties who profited the most from the wrongful conduct at issue.

admit that they *did* steal Plaintiff's client, Braintrust, as a result of the knowledge of the Former Employees gained while at Plaintiff. The errantly-delivered email between Hines and Twyford discussing Braintrust was sent only weeks or days, respectively, after each left Plaintiff. (Sanderson Decl., Exs. D & E.) Defendants now confirm that, as a result of this email, Braintrust came to work with Turtle Leads and that Turtle Leads earned revenue as a result of the relationship. This admission, standing alone, is sufficient to defeat the instant request for dismissal because it proves Plaintiff has a federal claim for violation of the DTSA.

Returning to the issue of diversity jurisdiction, Defendant argues that Plaintiff has not met the amount in controversy threshold because Plaintiff can only prove Defendants stole Braintrust and Defendants did not make $75,000 from Braintrust. This is untrue; when Plaintiff files its motion for summary judgment, it will identify the many Plaintiff affiliates Defendants signed as a result of its hiring of the Former Employees as well as Plaintiff's loss of business from the same. However, this level of detail, and volume of exhibits, is not required to defeat the instant motion— especially where Defendants have submitted no evidence of their own. Disgorgement of profits or other unjust enrichment are an appropriate measure of damages under Colorado law for misappropriation of trade secrets and intentional interference with contract. *See, e.g.,* C.R.S. §7-74-104 (under Colorado Uniform Trade Secrets Act, damages may include actual loss and unjust enrichment); *Westfield Dev. Co. v. Rifle Inv. Assocs*., 786 P.2d 1112, 1120 (Colo. 1990) (intentional interference is a tort and measure of damages can depart from contractual damages; wrongful profit is appropriate measure when circumstances require). Here, it is undisputed that, during its hiring of the Former Employees, Turtle Leads nearly doubled its year-over-year profits in 2020 and 2021, in an amount that far exceeds $75,000. Other than its unverified statements

regarding the Braintrust matter, Defendants provide no evidence to the Court to refute this amount of damages.

Second, the Court has already required Plaintiff to provide further detail on its alleged damages. Pursuant to the Court's request at the September 14, 2021 scheduling conference, Plaintiff submitted a supplemental Computation of Damages. (D.E. 29.) Indeed, Plaintiff's then-estimate of Defendants' wrongful profits has proven to be largely accurate when compared against Turtle Leads' Profit and Loss Statements for 2019, 2020, and 2021. In their Motion, Defendants do not address the Court's prior attention to this issue or refute Plaintiff's estimates and calculations.

Finally, and at the risk of sounding repetitive, to the extent Plaintiff does not have detailed financial records proving Defendants' earnings with respect to each affiliate at issue, this is because Defendants have refused to produce the same. If Defendants' own records were exculpatory, they would have produced them. Instead, Plaintiff only has Turtle Leads' Profit and Loss Statements to go off, but these records, along with the well-pleaded allegations in the Complaint, are sufficient to confer diversity jurisdiction, in the alternative to Plaintiff's federal law claim under DTSA.

**E.     Defendants' Motion is unsupported by facts or evidence.**

As previously noted, Defendants repeatedly refer to evidence without attaching it to their Motion and with a familiarity that presumes the Court has already seen it. Plaintiff objects to Defendants' reference to unauthenticated documents and information that are not provided for the Court's reference or supported by written declaration under penalty of perjury. One of the downsides of modern motion practice is that it permits a party to put forth a half-hearted effort, as

Defendants have done with their Motion, requiring the other party and the Court to expend substantially more time and resources in opposing and resolving the matter. Plaintiff understands that, as the Plaintiff in this action, it bears the burden of proof on its claims; however, Plaintiff is tired of bearing the burden of the shortcomings in Defendants' litigation strategy. The Court should send a clear message to Defendants that something more is required and deny the instant Motion to dismiss.

**CONCLUSION**

For all of the reasons set forth above, including because Defendants have already admitted the Court has subject matter jurisdiction over this case, the Court should deny Defendants' motion to dismiss.

Respectfully Submitted,
Dated: June 10, 2022

**KRONENBERGER ROSENFELD, LLP**

*s/Virginia Sanderson*
Virginia Sanderson
150 Post Street, Suite 520
San Francisco, CA 94108
Phone: (415) 955-1155
ginny@krinternetlaw.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date a true and correct copy of the foregoing has been served on opposing counsel through the Court's Automated ECF system.

DATED:  June 10, 2022

_____s/Virginia Sanderson_____
Virginia Sanderson